MILLER (UNITED STATES v.). See Cases Nos. 15,770–15,775.

MILLER (VAN KLEECK v.). See Case No. 16,860.

MILLER (VAN MARTER v.). See Case No. 16,863.

MILLER (WATERBURY BRASS CO. v.). See Case No. 17,254.

MILLER (WEED v.). See Case No. 17,346.

MILLER (WELLFORD v.). See Cases Nos. 17,380 and 17,381.

## Case No. 9,593a.

### MILLER v. WASHINGTON.

[2 Hayw. & H. 241.] [1]

Circuit Court, District of Columbia. March 16, 1857.

CONSTRUCTION OF CITY CHARTER—DEFINITION OF "OCCUR," "HAPPEN"—APPOINTMENT DURING RECESS OF BOARD OF ALDERMEN.

1. There is no difference in the meaning of the word "occur" in the charter of the city of Washington and the word "happen" in the constitution of the United States.

2. The clause in the charter of the city of Washington, referring to the nominations to be made by the mayor, and confirmed by the board of aldermen, was modeled after the constitution of the United States, and was intended to accomplish the same object.

3. A party rejected by the board of aldermen, on the mayor's nomination, cannot be reappointed by the mayor in the recess of the same board, to the same office from which he was rejected by the board.

This was an action of debt [by Aaron W. Miller against the mayor, etc., of Washington] on the following bill:

"Corporation of Washington. To A. W. Miller, M. D., Dr. For 5 months service as physician to Washington City Asylum and Small-Pox Hospital, from July 1st to November 30th, inclusive, at $50.00 per month. $250.

"Washington City, Dec. 15, 1856."

The plaintiff is one of the officers appointed by the present mayor (M. B. Magruder) after rejection by the board of aldermen, and now claims compensation for his services as physician to the alms house, at the rate fixed by law, during the period he has rendered such services, under temporary appointment by the mayor, "to expire at the end of the next ensuing session of the board of aldermen." (The corporation attorney, Mr. Carlisle, having given an opinion to the board of aldermen, affirming the power of the mayor to reappoint temporarily under such circumstances.)

W. H. Davidge, for plaintiff.

J. M. Carlisle, for the corporation.

DUNLOP, Chief Judge. By the case agreed it appears that the plaintiff was duly appointed physician of the city asylum and hospital by the mayor of Washington, which appointment was so made to fill a vacancy occurring in the recess of the board of aldermen; that the plaintiff qualified according to law, and discharged the duties legally appertaining to that office; that at the ensuing session of the

[1] [Reported by John A. Hayward, Esq., and Geo. C. Hazelton, Esq.]

board of aldermen, the plaintiff was nominated by the mayor to the board of aldermen for said office, to which nomination the board refused to consent, by which I understand, and it is admitted in the argument of the case agreed, he was rejected by the board of aldermen; that from time to time after the adjournment of said board sine die, and to the day of meeting regularly fixed by law, the plaintiff has been reappointed and has from time to time duly qualified, and at each meeting of the board (that is to say, separate and distinct sessions as fixed by law) has been nominated, but said nomination has not been consented to, (that is to say, has been rejected by the board of aldermen;) and there is due the plaintiff, who has faithfully discharged the duties of said office, the amount claimed in the account filed, if the mayor had the right from time to time to so appoint as aforesaid. It is further agreed, that any ordinance of the corporation touching the subject-matter of this suit shall be considered as making a part of the case agreed, and may be read in evidence at the hearing. The charter of 1820, which rules this case, (the charter of 1848 making certain officers elective by the people, not applying to this officer) in its second section says: "He (the mayor) shall nominate, and with the consent of the board of aldermen, appoint to all offices under the corporation (except commissioners of election) and may remove any such officer from office at his will and pleasure. He shall appoint persons to fill up all vacancies, which may occur during the recess of the board of aldermen, to hold such appointment until the end of their ensuing session." And in the fourth section of the same charter of 1820: "And each board shall meet at the council chamber on the second Monday of June next, for the dispatch of business, at 10 o'clock in the morning, and at the same hour on the second Monday of June in every year thereafter, and at such other time as the two boards may by law direct." The two boards, therefore, by their own ordinance, were, under this charter enabled, besides the annual session, to appoint and fix as many other sessions as they saw fit, and as the public interests required, and they exercised this power in the passage of the ordinance of the 3d of June, 1853 (see section 4). This 4th section makes in addition to the 2d Monday of June, each and every Monday from the 4th Monday in June to the last Monday in May, inclusive, the beginning of a distinct stated session. That is, therefore, a recess, in the meaning of the charter of 1820, between the stated sessions from Monday to Monday, whenever the board adjourns sine die, leaving the time of its reassembling to be as prescribed by ordinance.

The counsel for the plaintiff claim that the acts of the mayor, set forth in the case agreed, in continuing to reappoint the plaintiff to the office he now fills, after repeated rejections by the board of aldermen, are law-

ful exercises of power by the mayor under the city charter, and that the plaintiff is entitled to the salary appertaining to the office by law; that a vacancy having occurred in the recess of the board of aldermen, the first appointment was covered by the authority in the charter; that this first appointment, and the commission issued to the plaintiff, conferred on him the office to the end of the then next ensuing session of the board of aldermen; that his nomination by the mayor and rejection by the board of aldermen at that session did not terminate his office, but that it continued till the end of said session, and that when the board adjourned without day for that session a new vacancy occurred, which the mayor had authority to fill, and so on, session after session, under like circumstances, during the pleasure of the mayor. It is plain, if this is the true construction of the city charter, there is no check in the board of aldermen on the mayor's power of appointment to office. They hold their control by sufferance only, and at the mayor's will. It is said the enactment in the city charter herein cited is in substance the same with the provision in the constitution of the United States, on the same subject of appointments to office, and that several attorney generals of the United States have asserted doctrines, in construing the federal constitution, in harmony with the pretensions of the plaintiff in this case. Const. U. S. art. 2, sec. 2. The only difference in the two provisions, as to filling vacancies, is that in the city charter the power is to fill vacancies which may "occur" in the recess, and in the constitution of the United States, to fill the vacancies which may "happen" in the recess. In both the appointments are to continue till the end of the next session. There may be a difference in the meaning of the words "occur" and "happen," but I shall indulge in no verbal criticism, but treat the two provisions as in substance the same. I do not doubt that the city charter in this particular was modelled after the constitution of the United States, and was intended to accomplish, as to office, the same objects. Upon a careful examination of the opinions of the attorney generals, Mr. Wirt, Mr. Taney, Mr. Legare and Mr. Mason, it will be found they do not warrant the pretensions of the plaintiff. The case before Mr. Wirt, October 22d, 1823, was this: General Swartwout's commission as navy agent at New York, expired during the session of the senate. The president's nomination of another person at the same session of the senate, to fill that vacancy was not acted upon, and the senate adjourned, leaving the office vacant. The question before him was the power of the president under such circumstances to fill it.

Mr. Wirt says: 1 Op. Atty. Gen. 631: "Had the vacancy first occurred during the recess of the senate, no doubt would have arisen as to the president's power to fill it. The doubt arises from the circumstance of its having

first occurred during the session of the senate. But the expression used by the constitution is 'happen;' all vacancies that may happen during the recess of the senate. The most natural sense of this term is 'to chance, to fall out, to make place by accident.' But the expression seems not perfectly clear. It may mean 'happen to take place;' that is, 'to originate' under which sense the president would not have the power to fill the vacancy. It may mean, also, without violence to the sense, 'happen to exist;' under which sense the president would have the right to fill it by his temporary commission. Which of these two senses is to be preferred? The first seems to me most accordant with the letter of the constitution; the second, most accordant with its reason and spirit." He adopts the latter as most consistent with the spirit of the constitution, and resulting from the necessity of keeping the offices of the government filled. Again he says (page 632): "Put the case of a vacancy occurring in an office held in a distant part of the country on the last day of the senate's session; before the vacancy is made known to the president the senate rises. The office may be an important one; the vacancy may paralyze a whole line of action in some essential branch of our internal police; the public interests may imperiously demand that it shall be immediately filled; but the vacancy may happen to occur during the session of the senate, and if the president's power is to be limited to such vacancies only, as in the case put, must continue, however ruinous the consequences may be to the public. Cases of this character might be easily multiplied; and it would seem to me highly desirable to avoid a construction which would produce effects so extensively pernicious, if it can be done with a just respect to the language of the constitution. Now, if we interpret the word 'happen' as being merely equivalent to 'happen to exist' (as I think we may legitimately do) then all vacancies which, from any casualty, happen to exist at a time when the senate cannot be consulted as to filling them, may be temporarily filled by the president; and the whole purpose of the constitution is completely accomplished. The casualty which has prevented the co-operation of the senate may be such as in the case hypothetically stated above. It may arise from various other causes; the falling of the building in which they hold their sessions; a sudden and destructive pestilence disabling or destroying a quorum of that body; such an invasion of the enemy as renders their reassembling elsewhere impracticable or inexpedient; and a thousand other causes which cannot be foreseen. It may arise, too, from their rejecting a nomination by the president in the last hour of their session, and inadvertently rising before a renomination can be made. In all these cases there is no guilt, either on the part of the senate or the president; but, by some casualty, the vacancy happens to continue and to exist in the recess; and the public good, nay even the safety of the nation, may require it to be filled."

Mr. Wirt affirmed the power of the president to fill the vacancy in the recess of the senate. The facts in Gwinn's Case, 2 Op. Atty. Gen. 525. July 19, 1832, are thus stated by him: "After the adjournment of congress, on the 3rd of March, 1831, and before their meeting in December of the same year, a vacancy occurred in the above named office of register, and Sam'l Gwinn was appointed to fill it. During the late session of congress he was regularly nominated to the senate, and rejected by them. The president having afterwards received strong testimonials in his favor from the state of Mississippi, and being requested by one of the senators from that state to renominate him, his name was again sent to the senate, with the additional recommendations which had been forwarded to the president. The second nomination was made on the 11th of June, last. It was considered on the 10th of July, and laid on the table. And on the 16th of July, the last day of the session, the following resolution was moved and considered: 'Resolved, that the president of the United States be informed that it is not the intention of the senate to take any proceeding on the renomination of Sam'l Gwinn, to be register of the land office at Mount Salus, in Mississippi, during the present session.' This resolution was ordered to lie on the table; and the senate adjourned without taking any further order in the matter. In this state of things, can the president, during the recess, appoint Mr. Gwinn, or any one else to the office before mentioned?"

Mr. Taney adopted Mr. Wirt's interpretation of the constitution as to vacancies happening to exist in the recess, and decided that the president could fill the vacancy. In the course of his opinion he says (page 528): "It was intended to provide for those vacancies which might arise from accident, and the contingencies to which human affairs must always be liable. And if it falls out that, from death, inadvertence, or mistake, an office required by law to be filled is, in the recess, found to be vacant, then a vacancy has happened during the recess, and the president may fill it. This appears to be the common sense and natural import of the words used. They mean the same thing as if the constitution had said, 'If there happen to be any vacancies during the recess.' The framers of the constitution had provided for filling the offices, with the concurrence of the senate; but, foreseeing that, from the various casualties to which human concerns are exposed, vacancies would be found during the recess, they give power to fill them, until an opportunity can be afforded of bringing the appointments before the senate; and they use words which denote the character of the vacancies which they foresee may occur, and for which they are providing. He may fill

up vacancies which 'happen' during the recess. But vacancies are not designedly to be kept open by the president until the recess, for the purpose of avoiding the control of the senate. And the word 'happen' is used to describe the class and kind of vacancies, and not the particular time at which they took place. I might suggest another case, showing that the restricted construction contended for, cannot be the one contemplated by the framers of the constitution. Suppose a nomination made to a vacant office, and confirmed by the senate; the office is not filled until the person appointed accepts. Suppose he refuses to accept, and his refusal is not known until after the adjournment; in such a case, the original vacancy would remain unfilled; and as it took place during the session, and not after the adjournment, the president could not fill it. It cannot be imagined that such cases were intended to be excepted out of the power granted to him. It has been said that this power, if possessed by the president. may be so used as to defeat the intention of the constitution, and exclude the senate from all share in appointments. The answer to such an objection appears to be a plain one. If the president willfully abuses a power given to him, the constitution has a remedy. In this case the senate have had a full opportunity of acting, but have not acted, and have held the nomination under advisement, and left it to fall vacant as soon as they adjourned. They must be supposed to have had sufficient reasons for keeping the nomination in their power, and suspending their action upon it. The president could not nominate another person for the same office until this was disposed of, and was either withdrawn by him or finally acted on by the senate. And as the senate have had an opportunity of acting, but have determined to suspend their decision, I cannot see how an appointment now made by the president can be supposed to interfere with the rights of the senate. There is nothing in the case that can be construed into a desire to avoid their constitutional control." Can it be truly said in this case, after the repeated rejections and re-appointments of the same individual by the mayor of Washington, there was no desire to interfere with the rights of the aldermen, or to avoid the control secured to them in the city charter?

The case before Mr. Legare, Oct. 22, 1841, as assumed by him was (3 Op. Atty. Gen. 674): "A vacancy having occurred during a recess, the president had filled it up by a temporary appointment under the clause of the constitution in question; then after the meeting of the senate he made another appointment, which was not acted on by the senate; and so, the office being now vacant, the question is, has the president power to fill it up again by granting a commission which shall expire at the end of the next session of the senate." And Mr. Legare held the president could fill it again. "I say it has 'happened,'

for if any stress is laid on the peculiar use of the word as implying something fortuitous and unexpected. the presumption must be that the omission to confirm the nomination was a mere oversight." And again (page 675): "But if it has taken no order upon the president's nomination; if it has left a chasm quo ad hoc in the power or executing the law, and that, too, contrary to the commands of the law itself, the respect which the law acknowledges and challenges from that august body would require us to presume that the omission was a mere accidental one. The people, however, were wisely jealous of this great power of appointing the agents of the executive department, and chose to restrain its discretion by requiring it in all cases to nominate, but only in case it had the concurrence of the senate to appoint. But as it might be easily foreseen that to allow the execution of the law to depend altogether upon the discussions or movements of a deliberate assembly would bring with it all the evils of a plural executive, and lead to perpetual interruptions of the whole course of public affairs, and even to most dangerous interregna in the executive powers essential to the order and defence of society, the convention very wisely provided against the possibility of such evils, by enabling and requiring the president to keep full every office of the government during a recess of the senate, when his advisers could not be consulted; not only so, but, making allowance for the tardiness and uncertainties inseparable from debates and proceedings of all deliberate bodies, they extended this indispensable authority to the last moment of the session. My opinion is, that the same overruling necessity which applied to the original vacancy applies to the second one, created by an omission. of the senate to act on a nomination. That body has only a negative and secondary agency in appointment to office. It has no share of the executive power, properly so called, that is, active, discretionary executive power; it simply controls the head of that department in the choice of its agents."

Attorney General Mason's opinion of the 13th of August, 1846, was founded upon the following case (4 Op. Atty. Gen. 523): "During the year 1845, in the recess of congress, this (the office of postmaster, at Buffalo, New York) office being vacant, an appointment was made, and a commission granted, to expire at the end of the session of the senate next ensuing. During the late session of the senate, a person was nominated for permanent appointment according to law. The senate rejected the nomination on Saturday, the 8th of August, instant. On the 10th another nomination was made, on which the senate made no decision. The executive appointment made during the recess expired at the end of the session, and the question is, can any appointment be now made to supply the vacancy?" In the course of his opinion Mr. Mason says (page 525): "In the case of Amos Binney, as

in Swartwout's, the commission expired during the session of the senate; the nominations were not acted upon, and after the adjournment of the senate President Adams filled the vacancy by an executive appointment. From the commencement of the government it is believed that a power has been exercised, which would appear to be inconsistent with a construction of the section of the constitution which would confine the meaning of the word 'happen,' to the time at which the office is in fact vacated. In cases where an officer dies during the session of the senate, but notice of his death is not received until after adjournment, it has always been filled as a vacancy happening during a recess of the senate." Again he says (page 526): "It is doing no violence to the language of the constitution, to maintain that this vacancy happening from the inaction of the senate on the nomination made, is within the meaning of the section quoted, and may be filled by an executive appointment. I am not disposed to enlarge the powers of the president, by narrowing the wholesome restraints imposed by the constitution. But that instrument invests him with powers in good faith, and sufficient to enable him, by their exercise, to acquit himself of his duties to the public. The constitution, as a general proposition, gives to the president the power of appointment; to guard against its improper exercise the concurrence of the senate is made necessary. But, for the reason above stated, authority is given him to make temporary appointments; this power depends on the happening of vacancies when the senate is not in session. It is no disrespect to the senate to suppose that their failure to act on this nomination was accidental; nor is it an unauthorized conclusion, that in view of the construction established by the opinion referred to, the senate were aware that the president had power to avert any public mischief caused by this omission on their part; but, whatever may have been the cause, the vacancy did happen to exist when their session ended, and it is entirely within the objects with which the qualified power was given to exercise it in this case. I have not stated the arguments as fully as I would have done if the question had not been so elaborately discussed in the opinions of my predecessors to which I have referred. Whatever may be the estimate of that construction, by which the vacancies in Swartwout's and Binney's cases, occurring during the session, and not filled at the end of the session, I concur with Mr. Taney[2] and Mr. Legare, that when the office is lawfully filled until the session is closed, and happens to be vacant at that time, by reason of the inaction of the senate on the nomination of the president, it may be filled by an executive appointment. I cannot perceive that it is unsafe to adopt a construction which has been so long given, and to follow precedents

so long established, especially in a case where there has been no desire to avoid the controlling action of the senate, and where public considerations so imperiously require that the power shall be exercised."

It is thus seen that all these legal functionaries of the government, who have asserted the power of the president to fill vacancies existing, after a session of the senate has intervened since the vacancies originated, have done so in cases, and only in cases where the senate failed to act on the nominations duly made to that body and adjourned, leaving the office vacant. Mr. Wirt, it is true, asserts the same power in the case of a rejection in the closing hours of the senate, and rising inadvertently before another nomination could be made, but even he does not say that the rejected nominee is competent to fill the vacant place under the president's power to make another temporary appointment. It cannot be denied by any one who reads the clauses of the city charter herein cited, that congress meant to confer on the aldermen some control over the mayor in appointments to office, and it is admitted in the agreement that this is so as to permanent appointments, but not as to temporary appointments to fill vacancies. Judge Story, in his Commentaries, in treating of the powers in the federal constitution to appoint to office and to fill vacancies thus speaks (3 Story, Const. 1833, § 1524): "It would not, therefore, be a wise course to omit any precaution, which at the same time that it should give to the president a power over the appointments of those who are in conjunction with himself to execute the laws, should also interpose a salutary check upon its abuse, acting by way of preventive as well as of remedy. Happily, this difficult task has been achieved by the constitution. The president is to nominate, and thereby has the sole power to select for office; but his nomination cannot confer office, unless approved by a majority of the senate. His responsibility and theirs is thus complete and distinct. He can never be compelled to yield to their appointment of a man unfit for office; and, on the other hand, they may withhold their advice and consent from any candidate, who in their judgment does not possess the qualification for office. Thus no serious abuse of power can take place without the co-operation of two co-ordinate branches of the government, acting in distinct spheres. And in case of rejection, the most that can be said is that he had not the first choice. He will still have a wide range of selection; and his responsibility to present another candidate, entirely qualified for the office, will be complete and unquestionable." In section 1551 he says: "The propriety of this grant (that is to fill vacancies in the recess) is so obvious that it can require no elucidation. There was but one of two courses to be adopted; either, that the senate should be perpetually in session, in order to provide for the appointment of officers; or that the

---

2 Gwinn's Case, 2 Op. Atty. Gen. 525.

president should be authorized to make temporary appointments during the recess, which should expire, when the senate should have had an opportunity to act on the subject. The former course would have been at once burdensome to the senate, and expensive to the public. The latter combines convenience, promptitude of action, and general security." Section 1553: "By 'vacancies' they understood to be meant vacancies occurring from death, resignation, promotion, or removal. The word 'happen' had relation to some casualty not provided for by law."

In this case there is no casualty; the rejection is an event contemplated by law and provided for by law. The chief power of the mayor, in the city charter over appointments to office, is to nominate, and with the consent of the aldermen, to appoint. The lesser or subordinate power is to fill vacancies in their recess, when the aldermen cannot be consulted, and in that event the appointment is temporary, only to last till the end of the next session of the aldermen. But if the doctrine of the plaintiff's counsel is true, the check of the aldermen is a delusion, and their authority in approving or rejecting appointments is abrogated. The mayor, under the lesser power to make temporary appointments in the recess of the co-ordinate branch of the city government, draws to himself the whole control over the city officers, and keeps in office permanently, or at least during his own entire term of office, a public officer over and over again rejected by the aldermen, and in defiance of their rejection. The minor power absorbs the major, and the charter, which certainly meant to invest in the aldermen some control and check upon the mayor in filling the city offices, is to that extent repealed. In section 1502, Story says: "A power given by the constitution cannot be construed to authorize a destruction of other powers given in the same instrument. It must be construed, therefore, in subordination to it, and cannot supersede or interfere with any other of its fundamental provisions; each is equally obligatory, and of paramount authority within its scope, and no one embraces a right to annihilate any other." This principle of construction commends itself for its common sense, and is universal in its application to the true interpretation of all delegated powers, and in fact all written instruments. Such construction must be given to the city charter as will preserve all its provisions, and maintain the just authority both of the mayor and the board of aldermen. An officer rejected by the board of aldermen on the mayor's nomination cannot, I think, be re-appointed by the mayor in the recess of the same board. It must be presumed the aldermen acted in good faith, and believe the officer unfit for the station; at all events they have so determined. If they have abused their power they are answerable to the people who elected them. The charter gave them authority to act on the nomination and to reject it. The charter re-

quired the mayor to consult them in the appointment, and they have given their advice. The assent of both is required to invest the appointee with the office, and the aldermen have refused their assent and rejected the appointee. By the charter, although the aldermen cannot say who shall fill the vacant office, they have a right to say who shall not fill it, and in the case of Dr. Miller they have said he shall not. After Dr. Miller's first rejection, and after the adjournment of the aldermen, conceding Mr. Wirt's doctrine to be sound, that a vacancy still exists, or that a new vacancy has arisen, the mayor cannot reappoint the rejected appointee. In the language of Judge Story, he cannot have "his first choice," but he still has "a wide range of selection;" and the aldermen have assumed the responsibility to their constituents of limiting the range of his selection. Even Mr. Wirt does not intimate that a rejected nominee could be reappointed by the president in the recess of the senate. He plants himself upon the inaction of the senate; so do Chief Justice Taney, Mr. Legare and Mr. Mason. They all speak of cases where the senate has adjourned, without final action on the president's nomination. It is true in the case of Gwinn there was a rejection, but at the same session of the senate there was a renomination upon additional recommendations of character and the request of one of the senators of Mississippi, and the senate adjourned without acting on the renomination, and the chief justice relies on this inaction.

The case before us is not the case of a renomination at the same session of the aldermen on additional testimonials of character, a proceeding altogether proper and due to the confirming body, but the case of repeated rejections of the same nominee, at separate and distinct sessions of the aldermen, followed by repeated and renewed and continuing reappointments of the same rejected nominee up to the bringing of this suit, in which the plaintiff claims compensation for his services in said office. It seems strange to speak of a vacancy, by repeated rejections of the same nominee as a casualty, a happening by chance, which is supposed, and perhaps truly, by the learned attorney general referred to, to be the case where the senate has adjourned without action on the president's nominations, and so a vacancy "happening to exist," in the recess of the senate; the word "happen" in the constitution being constrained by Mr. Wirt to mean "happen to exist." A vacancy by rejection of a nominee, it would seem, is not a casualty, but an event contemplated by law, by the nomination of some other fit person; and, unless the rejecting body adjourns so suddenly that the executive has no time to make a new nomination, it cannot be justly said, even upon the principle of Mr. Wirt's opinion, that a vacancy has happened, or happened to exist, by chance, in the recess. Even where this last mentioned case occurs, by the sudden rising

of the confirming body without notice to the executive, the rejected nominee, for the reasons I have urged, cannot be reappointed in the recess. If he can, the minor power to fill vacancies subverts to the greater power to nominate, and with the consent of the aldermen, to appoint. He is excluded from the range of the executive selection, or the power and check of the senate in the one case, and the board of aldermen in the other is utterly gone.

I cannot acquiesce in any such construction of the city charter, or the constitution of the United States, to which it is likened, nor do I see any warrant for such construction of the constitution of the United States, in the opinions of any of the attorney generals of the United States, referred to in the argument. Dr. Miller, I think, after the determination of the first session of the board of aldermen, at which he was rejected, ceased to be lawfully in office, and the judgment of the court on the case agreed, must be for the defendants.

NOTE. The following rules were adopted March 25, 1857, by the court, in compliance with the provisions of an act of congress on the subject passed at the last session: "Three terms of this court shall be held in every year, commencing on the respective days following, viz: On the third Monday of October, on the third Monday of January and on the first Monday of May. The first term under this rule shall be held on the third day of October next."